**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SAMUEL INGRAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 5097** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | **Magistrate Judge Michael T. Mason** |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Samuel Ingram ("Ingram" or "claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner granted Ingram's claim for disability insurance benefits, but limited his benefits to the period from February 14, 2010 through September 8, 2011 under the Social Security Act (the "SSA"), 42 U.S.C. §§ 416(I), 423(d) and 1382(c). He was denied benefits from September 8, 2011 and thereafter. Ingram now argues that his benefits should continue beyond that date. The Commissioner filed a brief in response to claimant's motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied.

## I. BACKGROUND

### A. Procedural History

Ingram filed applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") on March 8, 2010. (R. 135-45.) Claimant alleged that he had been disabled since February 14, 2010. (R. 135, 142.) He claims he suffers from a back injury consisting of a spinal fusion from his T-4 to T-10 thoracic vertebrae, the placement of two rods and twelve screws in his back, an inability to lift or bend over, a broken rib and collapsed lung, and three broken vertebrae. (R. 168.) His applications were initially denied on June 10, 2010, and again on September 17, 2010, after a timely request for reconsideration. (R. 64, 77.) On September 23, 2010, Ingram filed a written request for hearing. (R. 695.) On January 5, 2012, he testified before ALJ Patricia Witkowski Supergan. (R. 30-48.) On February 8, 2012, the ALJ issued a decision finding that Ingram was disabled for the period from February 14, 2010 through September 8, 2011, but not for the period from September 9, 2011 and thereafter. (R. 695-708.) On March 30, 2012, Ingram requested review by the Appeals Council. (R. 22.) On May 6, 2013, the Appeals Council denied Ingram's request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-3); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Ingram subsequently filed this action in the District Court.

### B. Medical Evidence

#### 1. Treating Physicians

Ingram was hospitalized at Provena St. Joseph Medical Center ("St. Joseph's") on February 14, 2010 following a motor vehicle accident. (R. 266.) Ingram had consumed alcohol before entering his car. (*Id.*) He does not remember the moments before or after the accident, but his car was found "wrapped around a tree." (*Id.*) The

initial assessment of claimant upon hospitalization stated that he was intoxicated, and that he had a concussion, bilateral pulmonary contusions, rib fractures, a left pneumothorax, and he was known to abuse tobacco. (R. 267.) Ingram was treated for his left pneumothorax with the placement of a left chest tube. (R. 268.) There were no complications during that procedure. (*Id.*)

A computerized tomography ("CT") scan of claimant's thoracic spine on February 14, 2010 indicated significant abnormality from his T-5 through his T-9 vertebrae, including several burst fractures. (R. 293-94.) On February 17, 2010, claimant underwent emergency surgery to treat his multiple burst fractures. (R. 272.) The surgery consisted of a T-4 to T-10 vertebral fusion with bilateral pedicle screws and arthrodesis. (*Id.*) On February 18, 2010, a postoperative CT scan showed the presence of fusion with the hardware implanted during surgery. (R. 304.) Ingram was discharged on February 27, 2010. (R. 284.)

Following his discharge from St. Joseph's, Ingram began regular visits with Dr. Tamir Heronskey of the Joliet Neurosurgical Clinic on March 4, 2010. (R. 353.) At the March 4, 2010 meeting, Dr. Heronskey reported that Ingram was doing well overall, but was suffering from incision pain. (*Id.*) Dr. Heronskey said that he would see Ingram again three months after their first visit and another spinal CT scan would be performed. (*Id.*) The follow-up CT scan was performed on May 11, 2010 and showed no definite new findings of significance. (R. 371.)

On May 28, 2010, Ingram was again admitted to St. Joseph's following complaints of chest pain and shortness of breath. (R. 453.) Radiographs of Ingram's chest did not show any evidence of a pneumothorax or other acute cardiopulmonary

disease. (R. 506.) The radiographs did show that the orthopedic hardware in Ingram's thoracic spine appeared to be stable. (*Id.*) Claimant was eventually diagnosed with polycythemia and pericarditis. (R. 494-98.) Claimant's lab reports were monitored and his condition was stabilized to the point that he was discharged on March 30, 2010. (R. 452.) Ingram was advised to follow up with his primary care physician within one week of his discharge. (*Id.*)

On June 10, 2010, claimant met with Dr. Ali Lakhani to follow up on his diagnosis of polycythemia. (R. 525.) Dr. Lakhani advised Ingram to visit a transfusion center on a monthly basis for complete blood counts to monitor his polycythemia. (R. 526.) On June 21, 2010, Ingram met with Dr. Chris Kolyvas to follow up on his pericarditis. (R. 536-37.) Dr. Kolyvas recommended an echocardiogram to assess the situation, as well as tapering off claimant's medication. (R. 537.)

An MRI of Ingram's thoracic spine performed on April 29, 2011 showed persistent edema at the T-7 vertebra, mild persistent collapse or instability at the T-7 vertebra, and a persistent, very mild retro pulsed fracture fragment. (R. 599.) The MRI also showed that the surgical hardware was in good position and that the fused vertebrae were in good alignment. (*Id.*) Finally, the MRI showed that there were mild compression deformities of the T-5, T-8, and T-9 levels of the thoracic spine. (R. 600.) A CT scan of claimant's thoracic spine, also performed on April 29, 2011, showed no new significant findings. (R. 601.)

On May 19, 2011, Ingram had a visit with Dr. Heronskey during which he complained of pain, especially brought on when attempting to lift more than five pounds. (R. 603.) Dr. Heronskey reported that claimant's screws and rods were all in the proper

location and that a good bony healing around the location of the burst fracture had occurred. (*Id.*) Dr. Heronskey concluded that the hardware was the only explanation for Ingram's pain. (*Id.*) Dr. Heronskey decided that in order to relieve Ingram's pain, he would surgically remove the hardware. (*Id.*) Dr. Heronskey informed Ingram that the removal of the hardware was not an absolute guarantee that the pain would subside. (*Id.*)

On July 8, 2011, Dr. Heronskey performed surgery to remove the hardware from Ingram's back. (R. 629.) Dr. Heronskey reported that the removal was uneventful. (R. 637.) During the course of the surgery, Dr. Heronskey also explored the spinal fusion and reported that a good bony mass appeared to have formed. (*Id.*) Following the operation, claimant tolerated pain and was subsequently discharged on June 9, 2011. (R. 629.) Ingram was advised to follow up with his primary care physician in a week and with his neurosurgeon as advised. (*Id.*)

On July 15, 2011, Ingram had a procedure to drain subcutaneous fluid which had collected at the site of his previous surgical hardware. (R. 648.) During this procedure a drainage catheter was placed in claimant's back and used to aspirate serous sanguineous fluid, which was then sent for testing. (*Id.*) The test results proved negative for malignancy. (R. 649.) The catheter was left in place to allow for gravity drainage. (R. 648.)

On July 21, 2011, Dr. Heronskey stated that the drain continued to produce fluid, that the incision was dry, that Ingram should return in one week for another evaluation, and that the drain should remain in place for one week. (R. 652.) On July 28, 2011, Dr. Heronskey stated that the incision and fluid collection from the drainage catheter both

appeared to be clean.  (R. 651.)  Dr. Heronskey recommended that Ingram return to physical therapy and determined that there was no need for acute follow up unless more trouble arose.  (*Id.*)

On July 8, 2011, Ingram underwent an initial evaluation with a physical therapist at St. Joseph's.  (R. 659-61.)  During this evaluation, Ingram rated the pain around his thoracic spine as a four on a pain scale of one to ten.  (R. 659.)  The evaluation also showed that Ingram had slight to moderate limitation in all movements secondary to his spinal fusion and thoracic spine.  (*Id.*)  Overall goals for claimant's recovery, included gaining strength and mobility back.  (*Id.*)  Ingram's short-term goals included taking part in an at-home exercise program involving stretching and light strengthening for his back as well as decreasing his left rib pain to a level of one or two while sitting.  (R. 660.)  Ingram's long-term goals included reducing his pain to a consistent level of two or three, and taking part in a comprehensive home exercise program to strengthen his scapular stabilizers and trunk as well as his core stabilization.  (*Id.*)  The evaluation called for two to three physical therapy sessions per week for eight weeks.  (*Id.*)

A physical therapy discharge note dated August 31, 2011 stated that Ingram had received six therapy sessions and made slight to moderate improvement to his symptoms through therapy.  (R. 657.)  The note said that claimant's main problem was decreased core strength and endurance which would improve after two to three months of his home exercise program.  (*Id.*)  The discharge note also stated that Ingram had successfully achieved his short-term and long-term goals, which included reducing his pain to a consistent level three during his activities of daily living and ambulation.  (*Id.*)

Claimant met with Dr. Asad Cheema on September 8, 2011 (R. 658), and October 7, 2011 for consultation regarding his chronic pain. (R. 662.) At these visits, Dr. Cheema prescribed Ingram with Norco and Naproxen and called for follow-up visits the next month. (R. 658, 662.) Both reports indicate that Ingram was "taking his medication without side effects... [and] medications are allowing him to carry out his [activities of daily living] in a more pain free manner." (*Id.*) In January 2012, Dr. Cheema completed a "Pain Report" regarding Ingram. (R. 676-77.) In this report, Dr. Cheema stated that Ingram had mid-back pain including chronic, severe muscle spasms secondary to the injury caused by his motor vehicle accident. (R. 676.) The report also stated that claimant experienced chronic pain brought on by any lifting or twisting and that the pain level would likely increase if Ingram returned to work. (R. 677.) Dr. Cheema reported that Ingram's pain was relieved by medication, but that it did not alleviate the pain completely. (*Id.*) The report also indicated that a functional capacity evaluation would be needed to further complete the evaluation of Ingram. (*Id.*)

## 2. Agency Consultants

On June 8, 2010, Dr. Towfig Arjmand, acting as a medical consultant for the SSA, performed a Physical Residual Functional Capacity Assessment of Ingram. (R. 480-87.) In this assessment, Dr. Arjmand determined that claimant could occasionally lift and/or carry (including upward pulling) twenty pounds and frequently lift and/or carry (including upward pulling) ten pounds. (R. 481.) Dr. Arjmand also stated that Ingram could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and push

and/or pull (including operation of hand and/or foot controls) a limited amount in his upper extremities. (*Id.*)

Dr. Laura Rosch, serving as a medical expert for the SSA, completed a medical interrogatory regarding claimant's physical capabilities on December 26, 2010. (R. 542-51.) Dr. Rosch completed this interrogatory based upon evidence provided to her by the SSA as well as her professional knowledge. (R. 541.) Dr. Rosch determined that Ingram could lift and carry up to ten pounds frequently, from eleven to twenty pounds occasionally, and never anything above twenty pounds. (R. 542.) Dr. Rosch also determined that claimant could sit, stand, and walk for two hours each, without interruption, as well as sit, stand, and walk a total of six hours each, per eight-hour workday. (R. 543.) Dr. Rosch stated that Ingram could reach, handle, finger, feel, push, and pull continuously with both hands. (R. 544.) She also said that Ingram could operate foot controls continuously with both of his feet. (*Id.*) Dr. Rosch opined that Ingram could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; that he could frequently balance; but that he could never climb ladders or scaffolds. (R. 545.) She also determined that claimant could never be exposed to unprotected heights; occasionally be exposed to moving mechanical parts; and frequently be exposed to moving vehicles, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations. (R. 546.) Dr. Rosch stated that these limitations had lasted or would last for twelve consecutive months. (R. 547.)

Dr. Ashok G. Jilhewar, serving as a medical expert for the SSA, also completed a medical interrogatory regarding claimant's physical capabilities on January 8, 2012. (R. 679-88.) Dr. Jilhewar completed this interrogatory based upon evidence provided to him

8

by the SSA as well as his professional knowledge.  (R. 541.)  Dr. Jilhewar determined

that claimant could occasionally and frequently lift and carry up to, but never more than,

ten pounds.  (R. 679.)  Dr. Jilhewar stated that Ingram could sit for two hours at a time

without interruption as well as stand and walk for thirty minutes, each, without

interruption.  (R. 680.)  Dr. Jilhewar also said that Ingram could sit for eight hours total,

in an eight-hour work day, as well as both stand and walk for two hours each, in an

eight-hour work day.  (*Id.*)  Dr. Jilhewar stated that Ingram could frequently reach,

handle, finger, feel, push, and pull with both of his hands.  (R. 681.)  He also said that

claimant could frequently operate foot controls with both of his feet.  (*Id.*)  Dr. Jilhewar

stated that Ingram could occasionally climb stairs, stoop, kneel, crouch, and crawl; that

he could frequently balance and climb ramps; but that he could never climb ladders or

scaffolds.  (R. 682.)  He also determined that claimant could never be exposed to

unprotected heights; frequently be exposed to moving mechanical parts, moving

vehicles, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme

cold, and extreme heat; and occasionally be exposed to vibrations.  (R. 684.)  Dr.

Jilhewar determined that these limitations had lasted or would last for twelve

consecutive months.  (*Id.*)

### C. Claimant's Testimony

A hearing was held before the ALJ on January 5, 2012 and Ingram was

represented by an attorney.  (R. 24.)  Ingram testified that he held various jobs from

2000 through early 2010.  (R. 30, 44-47.)  From 2000 through 2003, Ingram worked in

receiving at K-Mart, as a valet at Harrah's, in inventory at Home Depot, filling aerosol

cans at Chicago Aerosol, and delivering materials for a heating and cooling company

named Comfort Control.  (R. 44-46.)  Claimant testified that during 2004 and 2005 he worked in shipping and receiving in a warehouse for a company called DSC Logistics.  (R. 46.)  Following this work, Ingram was employed in various capacities including yard man, delivery driver and yard foreman with RP Lumber Company.  (R. 46-47.)  Claimant testified that, upon being released from the lumber company, he began remodeling homes with a friend, which included building walls, painting, cleaning up yards, changing out appliances, etc.  (R. 30, 47.)  He did this until 2008 or 2009.  (R. 31.)  Claimant testified that he became employed as a yard man with Prairie Creek Logistics at some point in 2009 or 2010.  (*Id.*)  As of the date of the hearing, Ingram had not worked since January or February of 2010.  (R. 30.)

Ingram lives with his parents and his older brother.  (R. 34.)  He stated that he stopped working after he was involved in the motor vehicle accident.  (*Id.*)  Following this accident and the resultant surgeries and medical procedures, claimant felt as though he would be unable to perform everyday work duties due to the pain and discomfort he was experiencing.  (R. 31.)  In particular, claimant's pain and discomfort were localized to his back.  (R. 37.)  Ingram testified that sitting for extended periods of time resulted in sharp pains and enormous pressure throughout his entire back.  (*Id.*)  Ingram rated the pain he was enduring at the hearing before the ALJ as a seven on a pain scale of one to ten.  (*Id.*)  Claimant stated that he is able to sit for about an hour before the pain becomes too intense.  (R. 38.)  He testified that once the pain reaches a certain level he has to stand and walk around for anywhere from fifteen minutes to an hour before he can sit again.  (*Id.*)  Ingram also stated that he lies down for at least an hour, three times a day to take the pressure off of his back.  (R. 39.)

According to claimant, his condition at the time of the January 5, 2012 hearing had improved from before.  (*Id.*)  Ingram stated that, prior to his second surgery in July of 2011, he was unable to lift his arms above his head since his mobility was restricted by the hardware in his back.  (*Id.*)  Furthermore, claimant testified that prior to that surgery his pain was almost unbearable and he classified it as being a nine out of ten on a pain scale.  (*Id.*)  Ingram stated that during that time he would spend about seventy percent of the time lying in bed.  (R. 40.)  Ingram also testified that he was restricted from bending, twisting, and lifting more than ten pounds at a time.  (R. 31.) Ingram stated that, following the July 2011 surgery, the distance he could walk before encountering pain had increased from about two or three blocks to ten blocks.  (R. 40.) Claimant testified that the most he had lifted following his second surgery was a case of pop which still caused him pain.  (*Id.*)

Ingram continues to wake up at least five nights a week due to pain and discomfort.  (R. 41.)  His household work is limited to washing dishes (R. 34), and he is unable to do laundry because lifting the wet clothes was too hard. (R. 41.)  He occasionally socializes with friends, who come over to visit, watch movies and play video games.  (R. 34-35.)  He also socializes with friends on the computer through Facebook and by text message from his cell phone.  (R. 35.)  On a typical day, he wakes up, spends some time on Facebook, eats breakfast, lies down for a bit, eats lunch, goes back to the computer or watches tv, then takes a nap and waits for his mother to make him dinner.  (R. 37.)

Ingram testified that the last time he met with Dr. Heronskey, following his July surgery, was in either August or September of 2011.  (R. 31.)  Claimant testified that he

11

visited Dr. Heronskey regularly after July despite a note from Dr. Heronskey which read, "[n]o need for additional follow-up." (R. 32.) Ingram stated that he continued to meet with Dr. Heronskey due to fluid buildup on his spine. (*Id.*) He stated that he met weekly with Dr. Heronskey, despite never making any official appointments, so the doctor could inspect the incision on his back where a tube had been inserted to drain fluid buildup. (*Id.*)

Claimant testified that, throughout the course of his check-ups with Dr. Heronskey, he was provided pain medication. (R. 33.) Ingram stated that Dr. Heronskey referred him to a pain clinic for further treatment. (*Id.*) He went to the pain clinic on a monthly basis and was provided with refills for his pain medication by Dr. Cheema. (*Id.*) Claimant also testified that on the day of the hearing before the ALJ he had not taken any medication and had not been taking any on a regular basis around that time. (*Id.*) Ingram testified that, since the beginning of December, he had not been taking medication because his bill at the pain clinic "was too high." (*Id.*) Claimant also stated that he had not consumed alcohol since June 2010. (R. 36.)

### D. Vocational Expert's Testimony

Vocational Expert Stephen Sprauer (the "VE") also testified at the January 5, 2012 hearing. (R. 43-44, 48-55.) The ALJ asked the VE to classify claimant's past work. (R. 49.) VE Sprauer testified that claimant worked as a yard supervisor, which is classified as medium, skilled work in the Dictionary of Occupational Titles ("DOT"). (*Id.*) However, claimant described his work as very heavy as performed. (*Id.*) VE Sprauer testified that claimant worked as a lumber yard worker, which is classified as heavy, skilled work in the DOT. (*Id.*) Claimant, again, described his work as very heavy as

12

performed.  (*Id.*)  VE Sprauer testified that claimant worked as a forklift operator, which is classified as medium, semi-skilled work in the DOT.  (*Id.*)  Ingram also described the work as medium as performed.  (*Id.*)  VE Sprauer testified that Ingram was employed as a warehouse worker, which is classified as medium, unskilled work in the DOT.  (R. 50.) Claimant also described this work as medium as performed.  (R. 49.)  VE Sprauer testified that claimant worked as a heating and air conditioning installer, which is classified as medium, skilled work per the DOT.  (R. 50.)  However, Ingram said that his work was heavy as performed.  (*Id.*)  VE Sprauer testified that claimant worked as a delivery truck driver, which is classified as medium, semi-skilled work in the DOT.  (*Id.*) Ingram testified that his work was heavy as performed.  (R. 51.)  VE Sprauer testified that Ingram worked as a building repairer, which is classified as medium, skilled work in the DOT.  (*Id.*)  VE Sprauer was not made aware of claimant's description of this work. (*Id.*)  Finally, VE Sprauer testified that claimant worked as a parking lot attendant, which is classified as light, unskilled work in the DOT.  (*Id.*)

The ALJ asked VE Sprauer to assume the following hypothetical person: an individual with claimant's age, education, and work experience who (1) would have the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally; (2) could sit, stand, and walk for six hours out of an eight-hour day and do each without interruption for two hours; (3) could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; (4) could frequently balance, occasionally stoop, kneel, crouch, and crawl; (5) could frequently operate a motor vehicle; (6) could tolerate frequent exposure to extreme cold and heat, wetness, humidity, noise, vibration, and fumes; and (7) could tolerate occasional exposure to hazards, such as moving

machinery, but could not work at unprotected heights. (R. 51-52.) The ALJ asked the VE whether such an individual would be able to perform claimant's past relevant work. (R. 52.) VE Sprauer testified that such an individual would only be able to perform the duties of a parking lot attendant. (*Id.*)

The ALJ then asked VE Sprauer for any other job which such an individual would be qualified to perform. (R. 53.) VE Sprauer testified that the individual would be qualified for the positions of counter clerk, classified as unskilled, light work per the DOT; survey worker, classified as unskilled work per the DOT; and small products assembler, classified as unskilled work per the DOT. (*Id.*)

The ALJ then asked VE Sprauer to consider an individual with the same limitations as described above, but with the added limitation of only being capable of a sedentary level of exertion. (*Id.*) The ALJ asked VE Sprauer if any jobs existed for such an individual. (*Id.*) VE Sprauer testified that such an individual would be qualified for the positions of food and beverage order clerk, classified as unskilled per the DOT; bench-hand assembler, classified as unskilled per the DOT; and charge account clerk, classified as unskilled per the DOT. (R. 53-54.)

The VE further testified about the customary tolerance for unexcused or unscheduled absences as well as customary rest and break periods in a competitive work environment. (R. 54.) VE Sprauer stated that the customary tolerance for unexcused or unscheduled absences in a competitive work environment is six to eight days per year. (*Id.*) VE Sprauer also stated that the customary rest and break periods in a competitive work environment is fifteen to twenty minutes in the morning and afternoon as well as twenty to thirty minutes for lunch. (*Id.*) VE Sprauer testified that he

believed if a person were to exceed the customary limits of days off per year they would not be able to maintain competitive employment. (*Id.*) VE Sprauer also testified that, in his belief, any individual off task for ten percent of a work day would be incapable of competitive employment. (R. 55.)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.E.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decided questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to

enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.    Analysis under the Social Security Act**

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

Here, the ALJ followed the five-step analysis.  At step one, the ALJ found that claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity since his alleged onset date of February 14, 2010.  (R. 699.) At step two, the ALJ found that claimant had the following severe impairments: status

post motor vehicle accident and multi-level thoracic fusion.  (*Id.*)  At step three, the ALJ found that claimant did not have an impairment or combination of impairments that meets or medically equals one of the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four, the ALJ found that from February 14, 2010 through September 8, 2011, claimant had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.927(a).  (R. 700.)  The ALJ further found that claimant could only occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds.  (*Id.*)  The ALJ found that claimant could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Additionally, the ALJ determined that claimant could tolerate frequent exposure to extreme cold and heat, wetness, humidity, noise, vibration, and fumes.  (*Id.*)  And the ALJ found that claimant could occasionally work around hazards, such as moving machinery, but had to avoid all exposure to unprotected heights.  (*Id.*)  The ALJ found that from February 14, 2010 through September 8, 2011, claimant was unable to perform any past relevant work.  (R. 702.)  At step five, the ALJ found that, considering claimant's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in either the regional or national economy that claimant could perform from February 14, 2010 through September 8, 2011.  (R. 700.)  In particular, the ALJ found that "claimant would have been off task for 25% of the workday because of pain and would have frequently missed work because of treatment."  (*Id.*)  As a result, the ALJ found that claimant was under a disability from February 14, 2010 through September 8, 2011.  (*Id.*)

The ALJ also followed the five-step analysis for the period following September 8, 2011 and ultimately found that claimant's medical condition had improved and his

disability had ended.  (R. 704-08.)  At step one, the ALJ again found that claimant was

not engaged in substantial gainful activity and had not been engaged in substantial

gainful activity since his alleged onset date of February 14, 2010.  (R. 699.)  At step two,

the ALJ found that claimant had not developed any new impairment or combination of

impairments since September 9, 2011.  (R. 704.)  At step three, the ALJ found that

claimant does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (*Id.*)  At step four, the ALJ found that there was an increase in

claimant's RFC.  (*Id.*)  The ALJ determined that, since September 9, 2011, claimant has

had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and

416.967(a) except that he can never climb ladders, ropes, or scaffolds and only

occasionally climb ramps and stairs.  (R. 705.)  He can frequently balance, but only

occasionally stoop, kneel, crouch, and crawl.  (*Id.*)  Claimant can tolerate frequent

exposure to extreme cold and heat, wetness, humidity, noise, vibration, and fumes.  (*Id.*)

Claimant is limited to work that requires only occasional exposure to hazards, but can

frequently operate a motor vehicle.  (*Id.*)  The ALJ found that, beginning September 9,

2011, claimant was still unable to perform past relevant work.  (R. 707.)  However, at

step five, the ALJ found that, considering claimant's age, education, work experience

and RFC, there were jobs that exist in significant numbers in the regional and national

economy that claimant can perform.  (*Id.*)  He determined that the limitations that

previously existed were no longer a problem for claimant and beginning on September

9, 2011, he would no longer need to be off task as much and was therefore "capable of

making a successful adjustment to work that exists in significant numbers in the regional

18

and national economy." (R. 708.)  As a result, the ALJ found that claimant's disability

ended September 8, 2011.  (*Id.*)

Ingram now argues that the ALJ improperly rejected the opinion of the treating

pain specialist, that the ALJ improperly analyzed Ingram's credibility, and that he failed

to provide a meaningful review of his RFC.  We address each of Ingram's arguments

below.

### C.  The ALJ Properly Assessed The Opinion of the Treating Physician

Claimant first argues that the ALJ improperly rejected the opinion of his treating

physician, Dr. Cheema.  Generally, an ALJ gives the opinion of a treating physician

controlling weight because they are "most able to provide a detailed, longitudinal picture"

of the claimant's medical condition.  20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at

870 ("more weight is generally given to the opinion of a treating physician because of his

greater familiarity with the claimant's conditions and circumstances") (internal citations

omitted).  However, a treating physician's opinion is only entitled to controlling weight if it

is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"

and "not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(c)(2);

*Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); *see also Ketelboeter v. Astrue*,

550 F.3d 620, 625 (7th Cir. 2008) (*quoting* 20 C.F.R. § 404.1527(c)(2)); *see* 20 C.F.R. §

404.1527(c)(3) ("The more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight we will give

that opinion").  "If an ALJ does not give a treating physician's opinion controlling weight,

the regulations require the ALJ to consider the length, nature, and extent of the

treatment relationship, frequency of examination, the physician's specialty, the types of

19

tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)). Nevertheless, while different medical opinions must be considered in evaluating a claimant's medical impairments, "the final responsibility for deciding the issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). The ALJ is free to discount the opinion of the treating physician so long as he provides good reasons for doing so. *Clifford*, 227 F.3d at 870.

Here, we agree with the Commissioner that the ALJ's decision provides sufficient reasons for discounting the opinion of Dr. Cheema. First, the ALJ correctly found that the record does not contain any objective medical evidence from Dr. Cheema. There are two very brief reports from the two times he examined Ingram, and in both reports, Dr. Cheema stated the same findings: that Ingram's medication had "no side effects" and "was allowing him to carry out his activities of daily living in a more pain free manner." (R. 658, 662). Ingram relies on a pain report that Dr. Cheema completed in which he stated that Ingram suffered from chronic pain; but, as the ALJ noted, there are no other objective findings in the record to substantiate the conclusions in the report. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004) (holding that the ALJ correctly disregarded the treating physician's opinion where it was not supported by medical evidence or progress notes). The ALJ also noted that it appears that Dr. Cheema only saw claimant on two occasions. The ALJ concluded: "the absence of any objective examination findings and the fact that the record indicates Dr. Cheema only saw the claimant two times prior to forming his opinion [in the pain report] suggests Dr. Cheema relied on the subjective reports of the claimant." (R. 706.) We find that he

20

adequately explained his bases for disregarding Dr. Cheema's pain report, and that this conclusion was reasonable.  *See Dixon*, 270 F.3d at 1178 ("[a]n ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations"); *see also Purifoy v. Colvin,* 2015 WL 2448281, at *9 (N.D. Ill. May 21, 2015) (in disregarding an opinion of a treating physician, "the ALJ may also consider the length of the treating relationship and the frequency of visits.").  The ALJ has built the requisite logical bridge for us to conclude that he adequately dismissed the opinion of a treating physician.

Next, claimant argues that the ALJ's focus on the lack of a function-by-function analysis by Dr. Cheema is misplaced.  Ingram is correct that "the regulations do not require a treating physician to provide a function-by-function analysis of a claimant's ability to perform daily living or work-related activities, nor is the ALJ required to provide one." *Burnam v. Astrue*, No. 10–5543, 2012 WL 710512, at *15 (N.D.Ill. Mar. 5, 2012) (*citing Knox v. Astrue*, 327 Fed.Appx. 652, 657 (7th Cir. June 19, 2009)).  However, this was not the only basis that the ALJ provided when he disregarded Dr. Cheema's findings in his pain report.  The ALJ referred to the lack of a function- by-function analysis only to further demonstrate the lack of objective medical evidence to support Dr. Cheema's conclusions in the pain report.  As we discussed above, we find that his bases for disregarding the pain report were sufficiently articulated and that remand is not required.

### D.    The ALJ Credibility Determination was Not Patently Wrong

Ingram argues that the ALJ improperly analyzed his credibility.  As she was in the best position to evaluate the claimant's credibility, the ALJ is given deference in her

credibility determination. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Accordingly, "an ALJ's credibility determination will not be disturbed unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Nevertheless, the ALJ must provide specific reasoning to support her credibility determination and this support must be particular enough to allow the claimant and a reviewing body to comprehend her reasoning. *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007) (*citing* Social Security Ruling 96-7p).

Here, claimant contends that the ALJ's credibility analysis is improper because, he claims, it is logically and factually flawed. The ALJ's opinion does contain a factual flaw where it states that Ingram's pain reported in a physical therapy note "was a two on a scale of one to ten while sitting." (R. 707.) In fact, the physical therapy report only described Ingram's *rib* pain as a two on a pain scale of one to ten while sitting; his pain, in general, was a described as a three out of ten during his activities of daily living. (R. 657.) However, this minor misstatement is not enough to render ALJ's credibility determination patently wrong. *See Kittelson*, 362 Fed. Appx. at 557 (holding that an ALJ's imperfect adverse credibility determination does not render the entire credibility determination patently wrong).

In addition, the ALJ has adequately articulated the reasons supporting her decision for her credibility finding. She noted that despite his testimony that his severe pain continued well after the July, 2011 surgery, the few treatment notes in the record from this time period indicate that he was able to carry out his activities of daily living relatively "pain-free" and that his condition continued to improve. His physical therapy notes from late August of 2011 also note that his pain was a three out of a ten and Dr.

22

Heronskey stated that there was no need for any additional follow-up. (R. 651, 657.) Although he testified that he continued to see Dr. Heronskey, there are no records to support this claim. For these reasons, we find that the ALJ has sufficiently articulated his reasons for finding Ingram's testimony about pain lacking in credibility. *See Arroyo v. Colvin*, 2014 WL 3558705, at *13 (N.D. Ill. July 18, 2014) (ALJ's credibility finding was not patently wrong when claimant's testimony was contradicted by medical evidence in the record).

Ingram also alleges that the ALJ improperly drew a negative inference from his failure to seek out a low-cost alternative for pain medication. Ingram correctly states that an ALJ cannot discredit a claimant for failure to fill pain medication prescriptions when there was evidence that the claimant could not afford it. *See Purifoy,* 2015 WL 2448281, at *7. However, here, the ALJ reasoned that "there was no indication that Ingram sought any low cost treatment options." Moreover, Ingram's testimony was only that his "bill got too high." (R. 33.) There are no other references in the record that he had financial issues. *Compare Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("several of Craft's medical records noted... that [he] had been out of compliance with his medicine...because of his inability to cover the associated costs."); *Suess v. Colvin,* 945 F. Supp. 2d 920, 930 (N.D. Ill. 2013) (remanding where the ALJ drew a negative inference from claimant's failure to seek medical treatment despite "numerous references in the record to [claimant's] financial hardships."). We also note here that the ALJ did not rely solely on this factor in discrediting Ingram's testimony, and the fact that there were no other references to financial troubles, along with his ability to obtain pain medication prior to December of 2011 sufficiently justify the ALJ's credibility

determination.  *See Reed v. Colvin,* 2015 WL 764106, at *5 fn 10 (N.D. Ill. Feb. 23, 2015) ("the Court is mindful that the ALJ could have done more to investigate the extent of [claimant's] financial difficulties... But the ALJ's other reasons for discrediting [claimant] independently support his conclusions, and therefore any error in assessing [claimant's] financial difficulty was harmless.").  Therefore, remand on this basis is not required.

### E.    The ALJ's RFC Analysis Was Sufficient

Lastly, Ingram claims that the ALJ's two different RFC assessments do not constitute meaningful review.  During the fourth and fifth steps of the five-step inquiry in a social security case, the ALJ must evaluate the claimant's RFC.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  An RFC assessment is used to determine which work-related activities can be performed by a claimant despite his limitations.  *Dixon*, 270 F.3d at 1178; 20 C.F.R. § 404.1545(a)(1).  The RFC assessment must be based on all of the relevant evidence in the record.  *Young*, 362 F.3d at 1001; 20 C.F.R. § 404.1545(a)(1).  The ALJ must provide a narrative explanation of how she arrived at her conclusions in the RFC assessment.  *Brisco ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (citing Social Security Ruling 96-8p at *7) ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts.")).

Here, the ALJ found that Ingram had the RFC to perform sedentary work for the period from February 14, 2010 to September 8, 2011, but that his pain during this time would have caused him to be off task for twenty-five percent of the workday and that his need for treatment would have resulted in frequent absences.  (R. 700.)  In her second

RFC analysis, for the period from September 9, 2011 and thereafter, and ALJ found that Ingram continued to have the RFC to perform sedentary work. However, because of the noted improvement in his condition, the ALJ reasonably concluded that he would no longer need to be off-task for this amount of time. Claimant contends that the lack of this information makes the ALJ's second RFC analysis deficient. However, the record includes medical evidence to support the ALJ's decision. As the ALJ noted, by late August, sufficient time had passed since the July, 2011 surgery, he no longer needed to see Dr. Heronskey, physical therapy had enabled claimant to achieve long term goals, and his pain was reduced to a three out of ten (R. 651-62, 657). In addition, at this point in time, Dr. Cheema's records stated that Ingram was able to perform activities of daily living "pain-free," and that he was successfully managing his pain with medication. (R. 658, 662.) For these reasons, the ALJ found that Ingram could return to work as of this date. We find that this was a reasonable conclusion and that the ALJ adequately outlined his reasons for reaching this determination.

## III.   CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is denied. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 27, 2015**